## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DEBBIE KOZEL** | * | |
| **v.** | * | **Civil No. JKS–10–2180** |
| **MICHAEL J. ASTRUE,** | * | |
| **Commissioner of Social Security** | * | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Debbie Kozel brought this action pursuant to 42 U.S.C. § 405(g) for review of a final administrative decision of the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under the Social Security Act, 41 U.S.C. §§ 401–433 (the Act). Both parties' motions for summary judgment and Kozel's alternative motion for remand (ECF Nos. 15, 21) are ready for resolution and no hearing is deemed necessary. *See* Local Rule 105.6. For the reasons set forth below, Kozel's motions for summary judgment and remand will be denied and the Commissioner's motion for summary judgment will be granted.

### I.   <u>Background.</u>

Kozel protectively applied for DIB on January 30, 2006, alleging onset of her disability on January 1, 2000. Her application was denied initially and upon reconsideration. An Administrative Law Judge (ALJ) held a hearing on October 1, 2008, at which Kozel was represented by counsel. At that time, Kozel amended her onset date to November 30, 2003. (R. 9). On October 17, 2008, the ALJ found that Kozel was not disabled within the meaning of the Act, *id.*, and on June 10, 2010 the Appeals Council denied her request for review. (R. 1–3). Thus, the ALJ's determination became the Commissioner's final decision.

**II.**   **ALJ's Decision.**

The ALJ evaluated Kozel's claim using the five-step sequential process set forth at 20

C.F.R. § 404.1520.  First, the ALJ determined that Kozel has not engaged in substantial gainful

activity since her amended onset date.  (R. 11, 19).  At step two, the ALJ concluded that Kozel

suffers from the following severe impairments: depression, anxiety and/or panic attacks, and a

history of posttraumatic stress disorder (PTSD).  (R. 11.)  At step three, the ALJ determined that

Kozel does not have an impairment or combination of impairments that meet or medically equal

any of the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 11–12).

Further, the ALJ found that Kozel has the Residual Functional Capacity (RFC) to perform work

at all exertional levels, but is limited to performing unskilled tasks involving no more than

occasional contact with coworkers, supervisors, or the general public.  (R. 12).  At step four, the

ALJ found that Kozel was unable to perform any past relevant work.  (R. 15).  At step five, the

ALJ found, based on testimony from a vocational expert (VE), that jobs exist in significant

numbers in the national economy that Kozel can perform.  (R. 15–16).  As a result, the ALJ

determined that Kozel was not disabled within the meaning of the Act.  (R. 16).

**III.**   **Standard of Review.**

The role of this court on review is to determine whether substantial evidence supports the

Commissioner's decision and whether the Commissioner applied the correct legal standards.  42

U.S.C. § 405(g); *Pass v. Chater*, 65 F.3d 1200, 1202 (4th Cir. 1995).  Substantial evidence is

defined as "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co.*

*v. NLRB*, 305 U.S. 197, 229 (1938)).  It is more than a scintilla, but less than a preponderance, of

the evidence presented.  *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).  It is such

evidence that a reasonable mind might accept to support a conclusion, and must be sufficient to justify a refusal to direct a verdict if the case were before a jury. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). This court cannot try the case *de novo* or resolve evidentiary conflicts, but rather must affirm a decision when it is supported by substantial evidence. *Id.*

IV.    **Discussion.**

Kozel raises two broad issues on appeal. The first is that the ALJ failed to follow the proper procedure for analyzing Kozel's mental impairments. Kozel's second claim is that the ALJ erroneously assessed her RFC.

**A.  The ALJ Followed the Proper Procedure for Analyzing Kozel's Mental Impairments.**

Despite the ALJ's finding that she had severe mental impairments of depression, anxiety and/or panic attacks, and a history of PTSD, Kozel claims the ALJ failed to follow the required special technique to substantiate the presence of the three impairments and the functional limitations posed by those impairments. Specifically, Kozel claims that the ALJ: (1) failed to evaluate Kozel's pertinent symptoms, signs, and laboratory findings to determine whether she had a medically determinable impairment; (2) failed to specify the symptoms, signs, and laboratory findings that substantiated the presence of the impairment; (3) failed to consider all relevant and available clinical signs and laboratory findings, the effects of Kozel's symptoms, and how Kozel's functioning was affected by other factors; (4) failed to consider such factors as the quality and level of Kozel's overall functional performance, any episodic limitations, the amount of supervision or assistance Kozel required, and the settings in which Kozel was able to function; and (5) failed to identify the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment.

The proper procedure to evaluate a mental impairment, known as the "special technique,"[1] examines a claimant's pertinent symptoms, signs, and laboratory findings[2] to determine whether she has a medically determinable mental impairment or impairments.  20 C.F.R. §§ 404.1520a(b)(1) and 416.920a(b)(1).  The Social Security Regulations provide the following guidelines to outline how the ALJ should determine the claimant's RFC:

> We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function.

20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3).  The ALJ then rates the claimant's degree of limitation in activities of daily living, social functioning, and concentration, pace and persistence, as either none, mild, moderate, marked, or extreme, and also rates episodes of decompensation as either none, one or two, three, four or more.[3]  20 C.F.R. §§ 404.1520a(c)(4) and 416.920a(c)(4). The ALJ must then use these ratings to determine if the impairment meets, or is equivalent to, a listed mental disorder.[4]  20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2).  If the ALJ finds that the claimant has a severe mental impairment that neither meets nor is equivalent in severity to any listing, the ALJ will then assess the claimant's RFC.  20 C.F.R. §§ 404.1520a(d)(3) and

---

[1] This case is analyzed under the "special technique" and mental RFC framework described in *Davis v. Astrue*, CIV. JKS 09-2545, 2010 WL 5237850 (D. Md. Dec. 16, 2010).

[2] Symptoms are the claimant's own description of an impairment.  20 C.F.R. §§ 404.1528(a) and 416.928(a).  Signs, particularly psychiatric signs, are medically demonstrable abnormalities of behavior, mood, thought, memory, orientation, development, or perception that can be observed.  20 C.F.R. §§ 404.1528(b) and 416.928(b).  Laboratory findings can be shown by the use of medically acceptable laboratory diagnostic techniques; in the case of mental impairments, these are psychological tests.  20 C.F.R. §§ 404.1528(c) and 416.928(c).

[3] The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.  20 C.F.R. §§ 404.1520a(c)(4) and 416.920a(c)(4).  Episodes of decompensation are exacerbations or temporary increases in symptoms or signs, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).

[4] Listed mental disorders are found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.

416.920a(d)(3).  The ALJ's decision must include a specific finding as to the degree of limitation in each of the functional areas described in §§ 404.1520a(c) and 416.920a(c).  20 C.F.R. §§ 404.1520a(e)(4) and 416.920a(e)(4).

The ALJ only has to document use of the "special technique."  *Davis v. Astrue*, CIV. JKS 09-2545, 2010 WL 5237850, at *3 (D. Md. Dec. 16, 2010) (citing *Burke v. Astrue,* 306 F. App'x. 312, 315 (7th Cir. 2009).  In *Felton-Miller v. Astrue*, the Fourth Circuit concluded that the ALJ properly followed the special technique where he: (1) concluded, without discussion, that the claimant's depressive disorder was a severe impairment at step 2; (2) rated the claimant's limitations in the four functional areas at step 3; and (3) discussed the medical evidence pertaining to the claimant's depression when assessing her mental RFC.  459 F. App'x 226, 231 (4th Cir. 2011).  In *Burke,* the Court found that the ALJ properly performed the special technique by rating the claimant in the four functional areas and providing a finding as to the degree of limitation in each area.  306 F. App'x at 315.  As long as the reviewing court can discern "what the ALJ did and why he did it," the duty of explanation is satisfied; "administrative verbosity or pedantry" is not needed.  *Piney Mountain Coal Co. v. Mays,* 176 F.3d 753, 762 n.10 (4th Cir. 1999).  Even in a close call, a reviewing judge need only discern "what [the ALJ's] conclusions are and on what evidence they rest."  *Id.*

Here, substantial evidence supports the ALJ's evaluation of Kozel's mental impairments and resulting limitations.  The ALJ made the determination that Kozel's depression, anxiety and/or panic attacks, and history of PTSD were severe impairments based on "medical records from treating and examining sources as well as clinical and laboratory findings."  (R. 11).  The ALJ specifically referred to Dr. Ganjoo's treatment notes, dated November 18, 2005, which diagnosed Kozel with PTSD and bipolar disorder.  (R. 11; R. 325).

Based on the medical and non-medical evidence, the ALJ determined that Kozel has: mild restrictions of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.  (R. 12).  Because Kozel's mental impairments did not cause at least two "marked" limitations or one "marked limitation and "repeated" episodes of decompensation, the ALJ properly concluded that Kozel did not satisfy the "B" criteria for the listed impairments of: 12.04 affective disorders, 12.06 anxiety disorders, or 12.08 personality disorders.[5]  Because Kozel did not meet a Listing at step 3 of the sequential evaluation, the ALJ appropriately proceeded to assess Kozel's RFC at step 4 of the sequential evaluation.  *See* 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3).

---

[5] Under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, Affective disorders: To meet the severity requirement ("A" criteria) under the listing, a person's a disturbance of mood must be accompanied by a full or partial manic or depressive syndrome.  A depressive person must have at least four of the nine symptoms listed to meet the requirement; a manic person must have at least three of another eight symptoms listed; and a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes).  In addition, to meet the severity requirement, the person must also *either* show at least two of the following "B" criteria: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration, *or* produce, under "C" criteria, a medically documented history of at least two years' duration of a chronic affective disorder that has caused more than a minimal limitation on ability do basic work activities.  A "marked" limitation interferes seriously with the claimant's ability to function independently, appropriately, effectively, and on a sustained basis.  Under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (C).  "Repeated episodes of decompensation, each of extended duration" means three episodes within one year, or an average of once every four months, each lasting for at least two weeks.  *Id.* at (C)(4).

Similarly, under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06, Anxiety disorders: To meet the severity requirement under the listing, a person must experience anxiety as a primary disturbance or experience anxiety when she attempts to master her symptoms.  A person with an anxiety disorder must have at least one of the four symptoms listed.  In addition to the severity requirement, the person must *either* show at least two of the following "B" criteria:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration, *or* demonstrate a complete inability to function outside the home under criteria "C."

Under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.08, Personalitydisorders: To meet the severity requirement under the listing, a person must have deeply ingrained, maladaptive patterns of behavior associated with at least one of six specified conditions.  In addition, the person must have at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The Psychiatric Review Techniques administered on September 19, 2006 and February 20, 2007 indicated that Kozel's mental impairments did not satisfy the "C" criteria of the mental impairment listings for 12.04 affective disorders or 12.06 anxiety disorders.  (R. 151–64; 275–88).

Despite Kozel's assertions, the ALJ identified and evaluated the history of Kozel's impairments as well as the pertinent symptoms, laboratory findings, clinical signs, and functional limitations.  The ALJ's evaluations of Kozel's limitations under the mental RFC assessment reflected a "more detailed" assessment of the criteria "B" limitations identified at steps 2 and 3 of the sequential evaluation.  (R. 12).  Evidence considered during the mental RFC assessment included medical evidence of record, pertaining to the intensity, persistence, and limiting effects of Kozel's symptoms, as well as testimony by Kozel and her husband.  (R. 13).  Symptoms discussed in testimony included: low self-esteem, emotional difficulties, memory problems, social anxiety, panic attacks while driving, and sleeping and hygiene problems related to depression.  The testimony also revealed the history of Kozel's impairments and how her depression reportedly stemmed from past physical abuse and the death of her first husband.  *Id.* The ALJ also considered treatment records from Dr. Ganjoo, counseling records from Ms. Houtman, and findings of the State agency consultants.  (R. 14).  When discussing the medical evidence of record, the ALJ cited to specific counseling records, treatment notes, and a Global Assessment of Functioning (GAF) [6] score related to Kozel's symptoms and functional limitations.  *Id.*  Evidence supporting the ALJ's RFC assessment included Dr. Ganjoo's assessment that Kozel had "moderate" symptoms and limitations.  (R. 14; R. 319–26).

In this case, the ALJ's use of the "special technique," at steps 2 through 4 of the sequential evaluation, met the requirements set forth in *Davis* and *Felton-Miller*.  The ALJ followed the proper procedure for analyzing mental impairments when he: (1) found that Kozel's mental impairments of depression, anxiety and/or panic attacks, and history of PTSD constituted

---

[6] The Global Assessment of Functioning (GAF) scale is intended to measure an individual's overall level of functioning.  AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994). [hereinafter DSM-IV]

severe impairments at step 2; (2) rated Kozel's limitations in the four functional areas; and (3)

discussed the medical evidence pertaining to Kozel's three severe impairments.

**B.  The ALJ Properly Assessed Kozel's RFC.**

Kozel's second argument is that the ALJ erroneously assessed her RFC when he

determined that she could "perform a full range of work at all exertional levels but with the

following nonexertional limitations: due to her moderate difficulties in both social functioning

and concentration, persistence, or pace, the claimant is limited to unskilled tasks involving no

more than occasional contact with coworkers, supervisors, and the general public."  (R. 12).

Specifically, Kozel argues that the ALJ did not perform a function-by-function assessment after

finding severe impairments.  Kozel claims that the ALJ: (1) failed to base Kozel's RFC

Assessment on the medical evidence of record, (2) improperly evaluated the medical opinions of

Kozel's treating health care providers, and (3) gave undue consideration to Kozel's GAF score.

The RFC is the most work an individual can do, despite her limitations, for eight hours a

day, five days a week.  20 C.F.R §§ 404 .1545(a)(1) and 416.945(a)(1); SSR 96–8p, 1996 WL

374184, at *2 (July 2, 1996).  An RFC assessment must include a function-by-function

assessment based upon the claimant's functional limitations and ability to do work-related

activities.  SSR 96–8p, at *3.  However, although a function-by-function analysis is required,

SSR 96-8p does not require ALJs to produce a detailed statement in writing.  *Davis*, 2010 WL

5237850, at *5.  Rather, the ALJ "must include a narrative discussion describing how the

evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and

nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p, at *7; *see also Fleming*

*v. Barnhart*, 284 F. Supp. 2d 256, 271 (D. Md. 2003).  The ALJ "must discuss the individual's

ability to perform sustained work activities in an ordinary work setting on a regular and

continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  SSR 96-8p, at *7; *see also Taylor v. Astrue*, CIV.A. BPG-11-0032, 2012 WL 294532, at *6 (D. Md. Jan. 31, 2012) (explaining that an RFC assessment is sufficient if it includes "a narrative discussion of [the] claimant's symptoms and medical source opinions.").

### 1.  Medical Evidence of Record.

Kozel contends that the ALJ did not base the RFC on the medical evidence of record because the ALJ's RFC assessment did not include any of the limitations set forth by Kozel's treating social worker, Katherine Houtman (R. 165–70; 205–73) or Kozel's treating psychiatrist, Dr. Dida Ganjoo.  (R. 171–204; 294–326).  While the ALJ found that Kozel could work under certain circumstances, Dr. Ganjoo and Ms. Houtman stated that Kozel could not work and was unable to meet competitive standards of employment.  (R. 165–76, 187).  By contrast, one State physician concluded that Kozel had mild functional limitations (R. 151–64) and another State physician found insufficient evidence of functional limitations.  (R. 275–88).  The ALJ thus discussed all medical records but did not fully adopt any of them.

The ALJ must base the RFC assessment on "all of the relevant evidence in [the] case record."  20 C.F.R. §§ 404 .1545(a)(1) and 416.945(a)(1).  Under the regulations, medical evidence is not the only evidence the ALJ must consider; rather, he must view all "relevant medical and other evidence."  20 C.F.R. §§ 404 .1545(a)(3) and 416.945(a)(3); *see also* SSR 96-5P, at *5 (requiring an ALJ to consider both medical evidence and relevant nonmedical evidence such as observations from lay witnesses and the individual's own assessment of capabilities); *Felton-Miller*, 459 F. App'x. at 231 (holding that an ALJ is not required to obtain an expert

medical opinion on which to base his RFC assessment, but instead may properly base the assessment on the evidence in the record as a whole—including the individual's subjective complaints, objective medical evidence, and medical opinion evidence).  When evaluating medical opinion evidence, the ALJ need not accept or reject an opinion in full.  Rather, the ALJ should give weight to the medical opinion to the extent that it is supported by the evidence of record.  20 C.F.R. §404.1527(c)(2).

In the instant case, the ALJ correctly based his RFC assessment on all relevant sources of evidence including: the testimony of Kozel and her husband, Dr. Ganjoo's and Ms. Houtman's records, Kozel's GAF score, the Mental Impairment Questionnaires completed by Houtman and Dr. Ganjoo, and the findings of the state agency consultants.  (R. 12–15).  As will be discussed in greater detail below, the ALJ was entitled to give "limited evidentiary weight" to Dr. Ganjoo and Ms. Houtman's opinions that Kozel could not meet the competitive standards of employment.  Even though the ALJ was not required to accept the limitations assessed by Dr. Ganjoo, the ALJ nevertheless limited Kozel to no more than occasional contact with coworkers, supervisors, and the general public as a result of moderate difficulties in, *inter alia*, maintaining social functioning.  (*Compare* R. 12 (ALJ's RFC assessment) *with* R. 175 (Dr. Ganjoo's opinion that Kozel had moderate difficulties in maintaining social functioning)).  Because the ALJ relied on all relevant evidence in the record to reach his determination and articulated the basis for his assessment, he properly assessed Kozel's RFC.

### 2.  Medical Opinions of Treating Providers.

Kozel contends that the ALJ improperly assigned "limited evidentiary weight" to Dr. Ganjoo and Ms. Houtman's opinions that Kozel could not work on a sustained basis.  Dr. Ganjoo and Ms. Houtman expressed their opinions about Kozel's RFC by checking off boxes and

completing narrative sections of Mental Impairment Questionnaires.  (R. 165-170; 171-76).

Kozel claims that the ALJ: (1) improperly rejected the opinions of Kozel's treating healthcare

providers on the basis that their opinions were written nearly a year after her date of last

insurance (DLI) [7]; (2) erroneously determined that Dr. Ganjoo and Ms. Houtman's opinions

about Kozel's ability to work were inconsistent with their own treatment notes and counseling

records; and (3) erroneously rejected Houtman's opinions on the basis that she was an

unacceptable medical source.

    The ALJ accorded the opinions in the Mental Impairment Questionnaires "limited

evidentiary weight" on the grounds that the opinions were: (1) written a year after Kozel's DLI;

(2) inconsistent with other treatment notes and counseling records; and (3) expressed, in part, by

an unacceptable medical source.  (R. 14).  First, the ALJ opined that the earliest medical

evidence dated from October 2005—nearly two years after the alleged onset date (November 30,

2003)—and that most of the other medical evidence post-dated Kozel's date last insured

(December 31, 2005).  (R. 14).  The Questionnaires themselves were completed in late 2006,

approximately one year after Kozel's date last insured.  (R. 14)  Second, the ALJ found that

opinions in the Questionnaires conflicted with Houtman's records from February to July 2006,

which indicated that Kozel had improved energy and mood, seemed focused and calm, had

reduced anxiety during a trip to Florida, and was sleeping well.  (R. 14; R. 231, 233–34, 239–

40).  The ALJ also cited Dr. Ganjoo's records from April 2007 as evidence that Kozel was

"doing well on her medications; she was alert, well-related, and cooperative, although she was

anxious and related some difficulty concentrating."  (R. 14; R. 295).  Finally, the ALJ noted that

---

[7] To qualify for DIB, Kozel must show that she became disabled prior to the expiration of her insured status.  42 U.S.C. § 423(a)(1) and 423(c)(1); 20 C.F.R. § 404.131; *see also Johnson v. Barnhart*, 434 F.3d 650, 656 (4th Cir. 2005).  It is undisputed that Kozel's date last insured (DLI) was December 31, 2005.  (R. 9, 11, 19).

Houtman was not an "acceptable medical source" under the regulations but nevertheless discussed her opinion and records in detail.  (R. 14).

    **a)   Weight of Non-Contemporaneous Medical Evidence and Opinions.**

The Fourth Circuit has held that "medical evaluations made subsequent to the expiration of a claimant's insured status are not automatically barred from consideration and may be relevant to prove a previous disability." *Wooldridge v. Bowen,* 816 F.2d 157, 160 (4th Cir. 1987); *accord Moore v. Finch*, 418 F.2d 1224, 1225 (4th Cir. 1969).  As with other medical opinions, however, medical evaluations made subsequent to the claimant's DLI are not necessarily controlling or dispositive.  *Fortner v. Astrue*, SAG-10-CV-2529, 2011 WL 5299429, at *7 (D. Md. Nov. 2, 2011).  Previously, the Fourth Circuit has afforded "significant weight" to a physician's diagnosis of a plaintiff's pre-DLI condition, which was "based on objective medical criteria," but made after the plaintiff's DLI.  *Millner v. Schweiker*, 725 F.2d 243, 246 (4th Cir. 1984).  In addition, the Fourth Circuit held that an ALJ erred when he failed to explain why he disregarded a psychiatrist's diagnosis that was retrospective but not contradicted by other evidence.  *Strawls v. Califano,* 596 F.2d 1209 (4th Cir. 1979).  However, the Fourth Circuit has also held that the Commissioner could disregard a retrospective medical opinion by a treating physician in the face of contradictory evidence derived from contemporaneous clinical findings or the physician's own treatment records.  *Cooper v. Chater*, 1997 U.S. App. LEXIS 2826, at *4–6 (4th Cir. Feb. 19, 1997) (per curiam); *Montgomery v. Chater*, 1997 U.S. App. LEXIS 3336, at *4, *6 (4th Cir. Feb. 25, 1997) (per curiam); *see also Wilkins v. Secretary, Dep't Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

This court also distinguishes between written medical opinions, which may receive significant weight despite their retrospective nature, and check-off form reports that are entitled

to less evidentiary weight because of their "lack of explanation."  *Nazelrod v. Astrue*, CIV.A.

BPG-09-0636, 2010 WL 3038093, at *5 (D. Md. Aug. 2, 2010) (noting that ALJ properly

assigned less weight to check-off form report because such reports "are weak evidence at best").

Thus, while the Mental Impairment Questionnaires and supporting treatment notes are

not barred from consideration solely because they were written after Kozel's DLI, they have

limited probative value because they expressed opinions only about Kozel's RFC in late 2006,

and not before her DLI.  Houtman and Dr. Ganjoo's opinions respectively address Kozel's RFC

in November 2006 and December 2006.  (R. 165-70; 171-76).  Houtman's opinion did not refer

to Kozel's condition before December 31, 2005, but rather answered questions in the present

voice. (*See e.g.* R. 167, noting that Kozel's sleep "is" irregular; R. 168, noting that Kozel "is"

disorganized and "has" days when it is difficult to get out of bed).  Like Houtman, Dr. Ganjoo

noted current information in her answers, despite the Questionnaire's instructions to assess

Kozel's condition prior to December 31, 2005.  (R. 171).

The extent to which written opinions about Kozel's current functional limitations are

probative of Kozel's functional limitations before her DLI depends on the degree of consistency

between the retrospective opinions and the medical record as a whole.  *See e.g. Wilkins*, 953 F.2d

at 96.  As will be explained below, the ALJ properly found that the record, as a whole, suggests

that Kozel was capable of working.  As such, the ALJ properly gave limited weight to opinions

written after Kozel's DLI, which suggested that Kozel could work before December 31, 2005.

While it is less clear whether Houtman and Ganjoo intended their answers in the check-off boxes

to represent Kozel's condition at the time of the opinion or her condition before the DLI,[8] the

ALJ was entitled to assign such information less weight.  *See Nazelrod*, 2010 WL 3038093, at

*5.

---

[8] Dr. Ganjoo indicated that "the earliest date "on which the limitations he described applied was October 20, 2005.

**b)  Inconsistency between Mental Impairment Questionnaires and Medical
Evidence of Record.**

When analyzing the nature and severity of the claimant's alleged impairments, the ALJ

must give controlling weight to a medical opinion by a treating source that is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the applicant's] case record."  20 C.F.R. § 404.1527(d)(2); *see

also* SSR 96-5P, at *2; SSR 96–8p, at *7.   However, the ALJ may accord "significantly less

weight" to a treating source's medical opinion that is not well-supported or is inconsistent with

substantial evidence.[9]  *Craig. v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); *see also Baker v.

Chater*, 957 F. Supp. 75, 80 (D. Md. 1996).   Internal inconsistencies in a treating source's

opinion are a valid reason for rejecting the opinion.  *See Thomas v. Astrue*, PWG-09-2497, 2012

WL 1100660, at *2 (D. Md. Mar. 30, 2012).

The ALJ need not give controlling weight to treating source opinions on issues reserved

to the Commissioner such as: whether the claimant's alleged impairments meet a Listing, the

scope of the claimant's RFC, whether the claimant's RFC prevents her from doing past relevant

work, how vocational factors apply, and whether the claimant is "disabled" within the meaning

of the Act.  20 C.F.R. §§ 404.1527(e) and 416.927(e); SSR 96-5P, at *1–3.   However, the ALJ

must still explain the consideration given to the treating source's opinions about issues reserved

to the Commissioner and evaluate all of the evidence in the record to determine whether the

opinion is supported by the record.  *Thomas*, 2012 WL 1100660, at *2; SSR 96-5P, at *1–3.

When determining the claimant's RFC, the ALJ must weigh opinions on the claimant's RFC in

accordance with the factors listed at 20 C.F.R. §§ 404.1527 and 416.927—including the

---

[9] The exact weight owed to non-controlling medical opinions depends on: (1) whether the source has examined the applicant; (2) the treatment relationship between the source and the applicant; (3) the supportability of the opinion; (4) the consistency of the opinion with the record; and (5) whether the source is a specialist.  20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996); *Johnson*, 434 F.3d at 654; *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006).

supportability of the opinion and its consistency with the record as a whole—and provide

explanations for accepting or rejecting the opinions.  SSR 96-5P, at *3.

Here, the ALJ was entitled to give limited weight to treating source opinions about

Kozel's RFC since the opinions conflicted with substantial evidence in the record.  Dr. Ganjoo's

November 18, 2005 treatment note was the only treatment note from an acceptable medical

source written before Kozel's DLI.  (R. 177–85).  While the note indicated that Kozel had PTSD,

bipolar disorder, and family problems, the note did not indicate that Kozel was unable to work;

rather, it indicated that Kozel had a GAF score of 60,[10] well-developed dress and good hygiene,

no history of suicidality, and no illogical thinking.  (R. 177–85).  Ms. Houtman's five notes from

before Kozel's DLI, as well as medical evidence post-dating Kozel's DLI, provided inconsistent

information about Kozel's functional abilities.  At times, Kozel had "bad" days when she didn't

want to leave bed, "difficulty winding down," restless and broken sleep, anger, depression,

manic thought processes, and difficulty around crowds.  (R. 171–273, 294–326).  At intake,

Kozel told Houtman that she was unable to work because of depression and panic attacks.  (R.

212).  However, at other times, Kozel had such a happy affect, perkiness, improved sleep, good

hygiene and proper orientation that Houtman had "[n]o major concerns" and determined that

Kozel was "doing much better."  (R. 171–273; 294–326).  The ALJ properly determined, on the

whole, that this inconsistent evidence contradicted the opinion that Kozel lacked the RFC to

work.

Contrary to Kozel's contention, the ALJ did not cherry-pick positive treatment notes

from the record to support his findings about Kozel's RFC.  Rather, the ALJ's summation of the

---

[10] A GAF score between 51 and 60 corresponds to moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers).  DSM-IV at 32.

medical evidence indicates that he acknowledged Kozel's limitations, such as her anxiety and difficulty concentrating, even though he ultimately found that Kozel's condition was improving and she could do some work. (R. 14). As previously stated, the reviewing court should not attempt to reweigh the evidence *de novo* or resolve evidentiary conflicts. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. As such, this Court will not disturb the finding that the conflicting medical evidence, taken as a whole, indicates that Kozel had the ability to work. Since substantial evidence in the medical record conflicts with the opinions in the Questionnaires, the opinions are entitled to limited evidentiary weight.

**c) Opinion of Unacceptable Medical Source.**

The weight accorded to a treating source's opinion depends on whether the source is an "acceptable medical source" or an "other source." Under the regulations, a "medical opinion" may only come from an "acceptable medical source," such as a physician or psychologist. 20 C.F.R. §§ 404.1513(a), 404.1527(a)(2), 416.913(a), and 416.927(a). Opinions from "other sources," such as social workers and counselors, may offer insight into the severity of the applicant's impairment and how it affects an applicant's ability to function. 20 C.F.R. § 404.1513(d); SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2002).

Opinions from "other sources" cannot establish a medically determinable impairment, are not considered opinions from treating sources, and do not have controlling weight. SSR 06-03P, at *2; 20 C.F.R. §§ 404.1502, 404.1513(a), 404.1527(a)(2), 404.1527(d), 416.902, 416.913(a), 416.927(a)(2) and (e), and 416.927(d). The ALJ should evaluate opinions from other sources who have "seen the individual in their professional capacity," according to the five factors listed in 20 C.F.R. § 404.1527(d)(2) for acceptable medical sources. SSR 06-03P, at *5. After considering the probative value of the opinion and viewing other evidence in the record, the ALJ

may conclude that the opinion of a treating "other source" is entitled to limited weight.  *See e.g.*

*Craig*, 76 F.3d at 590; *Lane v. Astrue*, 2012 WL 1032705, at *5 (W.D. N.C. Mar. 9, 2012);

*Foster v. Astrue*, 826 F. Supp. 2d 884, 886 (E.D. N.C. 2011).

Contrary to Kozel's assertions, the ALJ did not reject Houtman's opinion in the Mental

Impairment Questionnaire solely on the basis that she is a licensed clinical social worker who is

considered an "other source" under the regulations.  On the contrary, the ALJ assigned

Houtman's opinion "limited evidentiary weight" because it was inconsistent with Houtman's

treatment notes and rendered a year after Kozel's DLI.  (R. 14).  As previously discussed,

Houtman's opinion about Kozel's RFC was inconsistent with the record as a whole, addressed an

issue reserved to the Commissioner, and post-dated Kozel's DLI.  Even without these

deficiencies, it is undisputed that Houtman is not an "acceptable medical source" under the

regulations; as such, her opinions do not merit the same deference as opinions from treating,

acceptable medical sources.  20 C.F.R. §§ 404.1513(a) and 404.1513(d); SSR 06–03P, at *2–3.

In sum, the ALJ was entitled to give Houtman's opinions limited weight.

### 3.  GAF Assessment.

Kozel contends that the ALJ improperly relied upon the GAF score of 60 which Dr.

Ganjoo assigned Kozel in November 2005.  (R. 14; R. 325).  Although the ALJ acknowledged

that Kozel's condition may have worsened after her DLI, he found that the November 2005 GAF

score and Houtman's counseling notes indicated that Kozel was capable of working before her

DLI.  (R. 14; R. 171, 205).  Kozel contends that the ALJ's use of the November 2005 GAF score

is reversible error because the ALJ did not acknowledge that the GAF score was rendered at the

time of Dr. Ganjoo's initial evaluation of Kozel in November 2005 and the ALJ did not reference

the longitudinal record.[11]  Kozel suggests that the ALJ "rel[ied] upon [Kozel's] one-time GAF

score, without any reference to the other evidence of record," and did not recognize that the GAF

"cannot be used in isolation from the rest of the evidence to make a disability decision."

The Social Security Administration (SSA) does not endorse the use of the GAF in Social

Security and SSI disability cases since the GAF does not directly correlate to the severity

requirements in the mental disorders listings.  *See* Revised Medical Criteria for Evaluating

Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50, 746–01, 764–65 (Aug. 21, 2000);

*see also Fortner*, 2011 WL 5299429, at *7; *Melgarejo v. Astrue*, CIV. JKS 08-3140, 2009 WL

5030706, at *2 (D. Md. Dec. 15, 2009).  However, even though a GAF score is not determinative

of whether a person is disabled under SSA regulations, it may inform the ALJ's judgment.  *See*

*e.g. Rios v. Comm'r of Soc. Sec.*, 444 F. App'x. 532, 535 (3d Cir. 2011) (finding that "[GAF

scores] are only medical evidence that informs the Commissioner's judgment of whether an

individual is disabled"); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)

(finding that, "[w]hile a GAF score may be of considerable help to the ALJ in formulating the

RFC, it is not essential to the RFC's accuracy.").

Here, the ALJ focused on the November 2005 GAF, since it was the only score rendered

before Kozel's DLI, but also acknowledged that later GAFs from November 2006 and December

2006 resulted in scores of 50.[12]  (R. 14; R. 171, 205).  Furthermore, the ALJ treated the

November 2005 GAF score as one piece of evidence to be considered alongside Kozel's mental

---

[11] The GAF score is properly viewed as evidence of a patient's ability to function at the time of the examination.  DSM-IV at 32-34.  Since a patient's level of functioning may fluctuate over time, a longitudinal study (i.e. a study that involves repeated observations over a long period of time) may be necessary to establish a patient's baseline GAF.  Aas, Monrad I. H. *Guidelines for Rating Global Assessment of Functioning (GAF)*, 10 ANNALS GEN. PSYCHIATRY (2011), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3036670/.

[12] A GAF score between 41 and 50 signals serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV at 32.

health records, medical opinion evidence, and the testimony of Kozel and her husband. (R. 13–15).  As such, the ALJ did not exclusively or unduly rely upon Kozel's November 2005 GAF score.  In sum, the ALJ properly assessed Kozel's RFC.

**V.      Conclusion.**

For the foregoing reasons, Kozel's motions for summary judgment and remand will be denied and Astrue's motion for summary judgment will be granted.  A separate Order will be entered.

Date:___July 17. 2012_____                  _____/S/_____ __
                                                                         JILLYN K. SCHULZE
                                                                    United States Magistrate Judge